01

02

03

04

05

06                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
07                              AT SEATTLE

08   VALERIE V. ROMANSKI, D.O.,          )    CASE NO. C09-0551-MAT
                                         )
09            Plaintiff,                 )
                                         )
10       v.                              )    ORDER RE: SOCIAL SECURITY
                                         )    DISABILITY APPEAL
11   MICHAEL J. ASTRUE, Commissioner     )
     of Social Security,                 )
12                                       )
              Defendant.                 )
13   _____)

14          Plaintiff Valerie V. Romanski, D.O., proceeds through counsel in her appeal of a final

15   decision of the Commissioner of the Social Security Administration (Commissioner).   The

16   Commissioner denied plaintiff's application for Disability Insurance Benefits (DIB) after a

17   hearing before an Administrative Law Judge (ALJ).   Having considered the ALJ's decision,

18   the administrative record (AR), and all memoranda of record, this matter is AFFIRMED.

19                    **FACTS AND PROCEDURAL HISTORY**

20          Plaintiff was born on XXXX, 1963.[1]   She completed a post-graduate doctorate program

21

22          1 Plaintiff's date of birth is redacted back to the year of birth in accordance with Federal Rule of
     Civil Procedure 5.2(a) and the General Order of the Court regarding Public Access to Electronic Case

01 and previously worked as an osteopathic physician.   (AR 105, 112.)

02       Plaintiff filed an application for DIB in October 2005.  (AR 16, 90.)  She alleged

03 disability beginning October 5, 2002, following a February 2002 incident in which she was

04 struck by lightning. (AR 90, 103.)   Her application was denied at the initial level and on

05 reconsideration, and she timely requested a hearing.

06       On September 16, 2008, ALJ Verrell Dethlof held a hearing, taking testimony from

07 plaintiff.  (AR 424-48.)   On October 22, 2008, the ALJ issued a decision finding plaintiff not

08 disabled.  (AR 16-27.)

09       Plaintiff timely appealed.   The Appeals Council denied plaintiff's request for review

10 on March 23, 2009 (AR 5-8), making the ALJ's decision the final decision of the

11 Commissioner.   Plaintiff appealed this final decision of the Commissioner to this Court.

12 **JURISDICTION**

13       The Court has jurisdiction to review the ALJ's decision pursuant to 42 U.S.C. § 405(g).

14 **DISCUSSION**

15       The Commissioner follows a five-step sequential evaluation process for determining

16 whether a claimant is disabled.   *See* 20 C.F.R. §§ 404.1520, 416.920 (2000).   At step one, it

17 must be determined whether the claimant is gainfully employed.   The ALJ found that plaintiff

18 did not engage in substantial gainful activity from her alleged onset date through her date last

19 insured, December 31, 2007.

20       At step two, it must be determined whether a claimant suffers from a severe impairment.

21 

22 Files, pursuant to the official policy on privacy adopted by the Judicial Conference of the United States. Plaintiff's counsel included plaintiff's full date of birth in the opening brief and is cautioned not to do so in the future.

01 The ALJ found plaintiff's laryngeal spasm severe. He found her cervical disc disease, vertigo,

02 and diverticulitis not severe.

03     Step three asks whether a claimant's impairments meet or equal a listed impairment.

04 The ALJ concluded that plaintiff did not have an impairment or combination of impairments

05 that met or medically equaled a listing.

06     If a claimant's impairments do not meet or equal a listing, the Commissioner must

07 assess residual functional capacity (RFC) and determine at step four whether the claimant has

08 demonstrated an inability to perform past relevant work. The ALJ found plaintiff capable of

09 performing light work, with the ability to lift and/or carry twenty pounds occasionally and ten

10 pounds frequently, to stand and/or walk (with normal breaks) for a total of about six hours in an

11 eight-hour workday, to sit (with normal breaks) for a total of about six hours in an eight-hour

12 workday, and to push and/or pull without limitation. With this RFC, the ALJ found plaintiff

13 retained the functional capacity to perform her past job as an osteopathic physician as she

14 performed it and as it is generally performed.

15     If a claimant demonstrates an inability to perform past relevant work, the burden shifts

16 to the Commissioner to demonstrate at step five that the claimant retains the capacity to make

17 an adjustment to work that exists in significant levels in the national economy. Finding

18 plaintiff not disabled at step four, the ALJ did not proceed to step five.

19     This Court's review of the ALJ's decision is limited to whether the decision is in

20 accordance with the law and the findings supported by substantial evidence in the record as a

21 whole. *See Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993). Substantial evidence means

22 more than a scintilla, but less than a preponderance; it means such relevant evidence as a

01  reasonable mind might accept as adequate to support a conclusion.  *Magallanes v. Bowen*, 881

02  F.2d 747, 750 (9th Cir. 1989).   If there is more than one rational interpretation, one of which

03  supports the ALJ's decision, the Court must uphold that decision.   *Thomas v. Barnhart*, 278

04  F.3d 947, 954 (9th Cir. 2002)

05       Plaintiff argues that the Commissioner erred in failing to give adequate weight to the

06  opinions of her treating physicians, in failing to find her disabled at step three, in assessing her

07  credibility, and in assessing her RFC and ability to perform her past relevant work.   She

08  requests remand for an award of benefits.   The Commissioner argues that the ALJ's decision is

09  supported by substantial evidence and should be affirmed.   For the reasons described below,

10  the Court agrees with the Commissioner.

11                                        Step Three

12       At step three, the ALJ must consider whether the claimant's impairments meet or equal

13  one of the impairments in the "Listing of Impairments" set forth in Appendix 1 to 20 C.F.R.

14  Part 404, Subpart P.   "In evaluating a claimant with more than one impairment, the

15  Commissioner must consider 'whether the combination of your impairments is medically equal

16  to any listed impairment.'" *Lester v. Chater*, 81 F.3d 821, 829 (9th Cir. 1996). Plaintiff bears

17  the burden of proving the existence of impairments meeting or equaling a listing.   *Burch v.*

18  *Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005).

19       In this case, the ALJ found that plaintiff did not have an impairment or combination of

20  impairments that met or medically equaled a listing.   He specifically found that plaintiff's

21  laryngeal spasm symptoms did not meet the requirements of medical listing 2.09, loss of

22  speech, because plaintiff "is able to produce speech that can be heard, understood and

01  sustained, as discussed throughout [the] decision." (AR 19.)

02     Plaintiff asserts that the combination of her laryngeal spasm, vertigo, diverticulitis, and

03  cervical and cognitive dysfunction together equal a listing level impairment. She contends

04  that the ALJ failed to consider the combined effects of these impairments.

05     Plaintiff does not proffer any plausible theory as to how her combined impairments are

06  medically equivalent to the criteria for a listed impairment, let alone meet her burden of

07  establishing medical equivalence. *See Burch*, 400 F.3d at 683 ("An ALJ is not required to

08  discuss the combined effects of a claimant's impairments or compare them to any listing in an

09  equivalency determination, unless the claimant presents evidence in an effort to establish

10  equivalence."); *Lewis v. Apfel*, 236 F.3d 503, 514 (9th Cir. 2001) (noting that plaintiff "offered

11  no theory, plausible or otherwise, as to" how his combined impairments equaled a listing).

12  Moreover, the ALJ sufficiently supported his conclusion that plaintiff's impairments did not

13  meet or equal a listing with the evaluation of the medical evidence. *See Gonzalez v. Sullivan*,

14  914 F.2d 1197, 1201 (9th Cir. 1990) ("It is unnecessary to require the Secretary, as a matter of

15  law, to state why a claimant failed to satisfy every different section of the listing of

16  impairments. The Secretary's four page 'evaluation of the evidence' is an adequate statement

17  of the 'foundations on which the ultimate factual conclusions are based.'") (quoted sources

18  omitted). Therefore, as argued by the Commissioner, plaintiff's step three argument lacks

19  merit.

20                    <u>Credibility</u>

21     Absent evidence of malingering, an ALJ must provide clear and convincing reasons to

22  reject a claimant's testimony. *See Vertigan v. Halter*, 260 F.3d 1044, 1049 (9th Cir. 2001).

01 *See also Thomas*, 278 F.3d at 958-59.   In finding a social security claimant's testimony

02 unreliable, an ALJ must render a credibility determination with sufficiently specific findings,

03 supported by substantial evidence.   "General findings are insufficient; rather, the ALJ must

04 identify what testimony is not credible and what evidence undermines the claimant's

05 complaints."   *Lester*, 81 F.3d at 834.   "We require the ALJ to build an accurate and logical

06 bridge from the evidence to her conclusions so that we may afford the claimant meaningful

07 review of the SSA's ultimate findings."   *Blakes v. Barnhart*, 331 F.3d 565, 569 (7th Cir. 2003).

08 "In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,

09 inconsistencies either in his testimony or between his testimony and his conduct, his daily

10 activities, his work record, and testimony from physicians and third parties concerning the

11 nature, severity, and effect of the symptoms of which he complains."   *Light v. Social Sec.*

12 *Admin.*, 119 F.3d 789, 792 (9th Cir. 1997).

13      The ALJ found that plaintiff's impairments could reasonably be expected to produce

14 some of the alleged symptoms, but that her statements concerning the intensity, persistence, and

15 limiting effects of those symptoms were not credible to the extent inconsistent with the RFC

16 assessment.   He provided the following reasoning in support of this assessment:

17      The record reflects no actual treatment immediately following the lightning
       strike, suggesting that her symptoms were not particularly troublesome.
18      Specifically, although the claimant alleged feeling left arm and chest pain as
       well as "burned toes," she did not immediately seek emergency care.   The
19      allegation that she later suffered laryngeal spasms as a result of the lightning
       strike cannot be confirmed by any objective medical evidence.   Her treating
20      physicians have been unable to make the correlation, which makes her
       allegations suspect.   I add that no burn marks on the claimant appear anywhere
21      in the treatment record, which would be consistent with evidence of a lightning
       strike.

22

Objective testing following her accident has been relatively normal. For example, as discussed earlier, imagining [sic] of the claimant's esophagus was judged to be "within normal limits." No organ damage was sustained, as determined by medical testing the next day. Pursuant to her complaints of difficulty swallowing, a CT scan of her lungs was performed as well as an EKG but both were normal. X-rays of her neck, a thyroid ultrasound and an esophagogram were similarly normal. A flexible laryngoscopy was performed that showed her vocal cords were normal and no evidence existed of any obstructions. In fact, her treating otolaryngologist stated her airway was completely normal and that obstruction was "not a problem." He believed that her symptoms would eventually abate.

Some improvement in claimant's condition has been noted in the record. During an office visit with her treating otolaryngology physician, in 2003, the claimant alleged she had not had bouts of laryngospasm in many months. In December 2003 she similarly reported that she had not had any recent laryngeal spasm problems, she experienced only intermittent shortness of breath and she did not have any recent emergency room visits. In November 2004 she reported her dizziness was "a little better," and the treatment notes state that her vertigo symptoms had improved. The claimant's massage therapist opined that although the claimant had muscle tension in her neck and shoulder that would radiate to her arms, low back and hips, her symptoms were reportedly relieved a "few days after massage therapy."

Additionally, the claimant failed to follow up on all recommendations. Specifically, Dr. Hillel suggested that there could be a psychological aspect to her condition. However, she "repeatedly" resisted any consideration of therapy or counseling.

The claimant has further described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. She testified that she started the day with getting her children ready for school. The claimant also had custody of her children, which can be quite demanding both physically and emotionally. Socially, the claimant reported to Dr. Washburn during her evaluation, discussed below, that she was able to socialize with friends by occasionally meeting for lunch, movies or antique shopping. These activities do not reflect the disabling limitations alleged by the claimant.

A third party opinion was submitted by Nancy Bednarczyk, the claimant's receptionist. Ms. Bednarczyk opined that she witnessed the progression of the claimant's symptoms, including voice and breathing problems that led her to eventually cancel all appointments. She was forced to communicate with the

01   claimant through notes, letters and emails due to her voice problems. As discussed throughout this decision, the cause of the claimant's symptoms cannot
02   be verified by any objective evidence. Also, Ms. Bednarczyk worked with the claimant, which may suggest she was not entirely impartial. For these reasons,
03   I do not give much weight to this opinion. I discount this lay testimony in this matter for the same reasons I find the claimant not credible. In this regard, I
04   am unable to credit this lay testimony in this matter as probative in terms of the ultimate issue of disability in light of the medical and other factors of this case.
05   One reason for which an ALJ may discount lay testimony is that it conflicts with medical evidence.

06

07   In addition, the claimant has an incentive to refrain from working. She testified that she was receiving approximately $5,000 a month from her private disability
08   insurance. I note that according to the claimant's earnings records, she only approached this amount of earnings for two years. Most years the claimant
09   made about one-third of this amount, as claimed on her income tax. Motivation and the issue of secondary gain must be considered in assessing the credibility of the claimant's allegations of disability.

10

11   Lastly, pursuant to the claimant's complaints and allegations, a fraud investigation was instigated. Investigators located the claimant's residence,
12   which was described as a farm. The claimant was observed walking without any difficulty, she was able to bend, squat, stand up, open livestock gates, handle
13   animals, gesture during conversation, turn her head and she was "quite articulate" when communicating. Despite her alleged breathing and vertigo
14   problems no noticeable difficulties were observed. She never seemed out of breath and was actually quite talkative. Overall, it was apparent that the
15   claimant was extremely active on a daily basis. In sum, the investigator found, by a preponderance of the evidence, that the claimant knowingly provided false
16   information concerning her functional limitations. Therefore, the investigator found that it was appropriate to disregard her allegations concerning her symptoms.

17

18   Numerous letters were submitted by Dr. Koss negating the fraud investigator's report. However, Dr. Koss only provided his personal observations and
19   subjective reasoning to refute the findings. He also has a personal, not a treating relationship with the claimant, as discussed below, which makes his opinions less credible.

20

21   (AR 20-22; internal citations to record and case law omitted.)

22   Plaintiff asserts that the ALJ's statement regarding her lack of motivation to return to

work is inconsistent with the fact that she attempted to work for eight months after the lightning strike (AR 127-29), and that it ignores her obvious earning potential as a medical doctor. She further asserts inconsistency in this statement with her educational, work, and general life history. (AR 120, 127-29, 441-43.)

Plaintiff takes issue with the speculation that she did not suffer a lightning strike injury, pointing to the observation of red marks on her skin after the incident by Richard Koss, D.O. (AR 310), her testimony of burn marks on her toes (AR 439), and evidence as to a property damage claim following the incident (AR 61 (fraud report) and 127 (plaintiff's statement)). She asserts good reasons for her failure to more aggressively seek treatment, noting that she is a trained and licensed physician, that she self-prescribed the same treatment Ronald Kane, M.D., did following the incident (AR 273), and the difficulty associated with treating lightning strike injuries given their rarity (AR 268, 279, 338, 341-42). *See Orn v. Astrue*, 495 F.3d 625, 638 (9th Cir. 2007) ("[A]n 'unexplained, or inadequately explained, failure to seek treatment' may be the basis for an adverse credibility finding unless one of a 'number of good reasons for not doing so' applies.") (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)). Plaintiff asserts the existence of objective evidence supporting her impairments. (*See* AR 270 (January 2003 MRI corresponding to cervical spine two-level disc herniation); AR 324 (functional capacity evaluation conducted by occupational and physical therapists in January 2004 stated: "She was limited by reports of cervical and thoracic pain as well as an observed elevated heart rate."); AR 369 (August 2006 letter from licensed massage practitioner reporting "lymphatic restrictions" and "overall fullness" in plaintiff's neck and chest); AR 377 (May 2008 videostroboscopy revealed rotated larynx, that right piriform sinus was more open than left,

01 presence of aperiodic mucosal wave, with marked anterior and posterior compression

02 associated with hyper adduction).)   She also points to evidence of deterioration.  (AR 371

03 (May 2008 letter from Dr. Kane stating that plaintiff's "condition has worsened, as her voice

04 has further deteriorated."))   She adds that the ALJ improperly assigned weight to a brief,

05 non-medical observation of innocuous activities by a fraud investigator, as discussed further

06 below.

07      Plaintiff avers that the ALJ inaccurately described her daily activities.   Pointing to the

08 ALJ's later comments that "she was able to care for her three adolescent children," and "lived in

09 a three level house[]"   (AR 24), plaintiff notes that her oldest child is a college sophomore (AR

10 24) and that she moved to a one-story home due to her impairments (AR 362).   Plaintiff further

11 states that her younger adolescent children ready themselves for school and prepare their own

12 meals (AR 427-28), that she cannot take care of her animals (AR 120, 444-45), and that Dr.

13 Koss located his practice near to her so that he can respond immediately if she experiences

14 problems with breathing and choking (AR 301).   Plaintiff further asserts that she should not be

15 penalized for trying to lead a normal life.   *See*, *e.g.*, *Reddick v. Chater*, 157 F.3d 715, 722 (9th

16 Cir. 1998) ("Several courts, including this one, have recognized that disability claimants should

17 not be penalized for attempting to lead normal lives in the face of their limitations.")

18      As argued by the Commissioner, plaintiff fails to demonstrate reversible error in the

19 ALJ's credibility assessment.   The ALJ reasonably stated that plaintiff's disability insurance

20 benefits provided an incentive to refrain from working.   *See Tommasetti v. Astrue*, 533 F.3d

21 1035, 1040 (9th Cir. 2008) (upholding as reasonable an ALJ's reliance on the fact that the

22 claimant may not have been motivated to work based on a "financial reserve").   While plaintiff

01    may have substantial earning potential as a doctor, the ALJ accurately noted that her work

02    history reveals fairly modest earnings, mostly below the amount she now receives through

03    disability insurance benefits.  (AR 86, 159-60 (plaintiff earned in the range of fifty to sixty

04    thousand dollars in 2000 and 2001, but otherwise earned in the twenty to thirty thousand dollar

05    range as a practicing osteopathic physician).)

06            The ALJ also reasonably raised questions regarding both the origin of plaintiff's injuries

07    and the minimal supportive objective evidence in the record.  Whether or not plaintiff is a

08    physician, it seems reasonable for the ALJ to find noteworthy her failure to seek medical

09    treatment after being struck by lightning.  *See generally Sample v. Schweiker*, 694 F.2d 639,

10    642 (9th Cir. 1982) (an ALJ is "entitled to draw inferences logically flowing from the

11    evidence").  When she did seek treatment, approximately a week after the incident, Dr. Kane

12    did not mention either red or burn marks, instead stating:  "No obvious burn marks."  (AR

13    273.)  Also, while plaintiff is likely correct as to the difficulties associated with treating

14    victims of lightning strikes, she does not point to evidence contradicting the ALJ's finding that

15    the correlation between her laryngeal spasms and the lightning strike had not been confirmed by

16    objective evidence or otherwise by her treating physicians.   Plaintiff identifies some objective

17    findings in the record, but it remains that the record as a whole reveals relatively normal

18    findings, as discussed by the ALJ.  (AR 20-21.)  "While subjective pain testimony cannot be

19    rejected on the sole ground that it is not fully corroborated by objective medical evidence, the

20    medical evidence is still a relevant factor in determining the severity of the claimant's pain and

21    its disabling effects."  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); Social Security

22    Ruling (SSR) 96-7p.  Additionally, while plaintiff accurately observes that the fraud

01 investigator is not a medical professional and that he observed her only briefly, his third party

02 impressions unquestionably remain relevant. *See generally Light*, 119 F.3d at 792. The ALJ

03 also pointed to evidence of improvement in plaintiff's condition and her failure to follow up on

04 recommendations. (AR 21.)

05 Finally, the ALJ appropriately pointed to plaintiff's daily activities. The fact that the

06 ALJ at one point erroneously identified all three of plaintiff's children as adolescents and failed

07 to clarify that she at some point moved to a single story home (*see* AR 24) can be deemed

08 harmless given the existence of other, valid reasons for finding her less than fully credible.

09 *Carmickle v. Commissioner, Soc. Sec. Admin.*, 533 F.3d 1155, 1162-63 (9th Cir. 2008) (citing

10 *Batson v. Comm'r of Soc. Sec. Admin.*, 359 F.3d 1190, 1195-97 (9th Cir. 2004)). Also, while

11 plaintiff testified that her children are "pretty good at getting themselves up and going[]" in the

12 morning for school, she also indicated her general involvement in this process (AR 427 ("[S]o

13 the day starts with sort of making sure my kids are getting themselves up and getting ready and

14 getting going to get themselves to school.")), as she had previously on a form (AR 119 ("I then

15 get my children ready for school.")). These and other statements in the record provide support

16 for the ALJ's observation that child custody can be physically and emotionally demanding.

17 (AR 119 ("After my children come home I help them with homework, dinner[.]"), AR 120 ("I

18 help [my children] with meals and homework and take care of them when they are not feeling

19 well."), AR 123 (plaintiff stated that "on a regular basis" she goes to "childrens [sic] school and

20 seasonal sports events with children activities.")) The ALJ also pointed to plaintiff's ability to

21 occasionally socialize with friends for lunch, movies, and antique shopping. (AR 21.) Taken

22 as a whole, the activities identified by the ALJ can reasonably be construed as inconsistent with

01  her claimed limitations.  *See Reddick*, 157 F.3d at 722 (activities inconsistent with claimed

02  limitations have bearing on credibility).

03  In sum, plaintiff fails to demonstrate reversible error in the ALJ's credibility

04  assessment.

05  <u>Physicians' Opinions</u>

06  In general, more weight should be given to the opinion of a treating physician than to a

07  non-treating physician, and more weight to the opinion of an examining physician than to a

08  non-examining physician.  *Lester*, 81 F.3d at 830.  Where not contradicted by another

09  physician, a treating or examining physician's opinion may be rejected only for "'clear and

10  convincing'" reasons.  *Id*. (quoting *Baxter v. Sullivan*, 923 F.2d 1391, 1396 (9th Cir. 1991)).

11  Where contradicted, a treating or examining physician's opinion may not be rejected without

12  "'specific and legitimate reasons' supported by substantial evidence in the record for so doing."

13  *Id*. at 830-31 (quoting *Murray v. Heckler*, 722 F.2d 499, 502 (9th Cir. 1983)).

14  The ALJ may reject physicians' opinions "by setting out a detailed and thorough

15  summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and

16  making findings."  *Reddick*, 157 F.3d at 725 (citing *Magallanes*, 881 F.2d at 751).  Rather

17  than merely stating his conclusions, the ALJ "must set forth his own interpretations and explain

18  why they, rather that the doctors', are correct."  *Id*.  (citing *Embrey v. Bowen*, 849 F.2d 418,

19  421-22 (9th Cir. 1988)).

20  "The opinion of a nonexamining physician cannot by itself constitute substantial

21  evidence that justifies the rejection of the opinion of either an examining physician or a treating

22  physician."  *Lester*, 81 F.3d at 831 (citing *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir.

01 1990) and *Gallant v. Heckler,* 753 F.2d 1450, 1456 (9th Cir. 1984)).   However, "the report of a

02 nonexamining, nontreating physician need not be discounted when it 'is not contradicted by *all*

03 *other evidenc*e in the record.'" *Andrews v. Shalala*, 53 F.3d 1035, 1041(9th Cir.1995) (quoting

04 *Magallanes*, 881 F.2d at 752 (emphasis in original)).

05    The ALJ considered the medical opinions as follows:

06    . . . Ronald Kane, M.D., Medical Director of the Valley Medical Center
submitted an opinion on February 8, 2005.   Dr. Kane reiterated that the
07    claimant was struck by lightning in February 2002.   He alleged following this
accident she sustained subsequent laryngospasm and neck pain.   According to
08    Dr. Kane the claimant had "numerous appointments for disability
determinations" and she was deemed "permanently and competed disabled"
09    from working in her profession as well as all other professions.   He allegedly
"evaluated" her and found she continued to have difficulty speaking and became
10    hoarse.   She also became easily fatigued and experienced exacerbations in her
neck.   These symptoms were controlled with medication but they did not
11    provide complete relief, according to Dr. Kane.   In conclusion, Dr. Kane
opined that the claimant had reached maximum medical improvement.   He
12    stated that she continued to be disabled, requiring daily medication.   Dr. Kane
did not feel the claimant's symptoms would improve.

13

14    Dr. Kane's allegations are not only subjective but also lack any basis for finding
the claimant disabled.   He referenced an MRI of her cervical spine and
15    problems with her vocal cord movement; however, the objective testing shows
both are relatively minor impairments and certainly would not rise to the level of
16    rendering the claimant unable to perform any work.   Further, Dr. Kane
referenced others who have found her disabled yet these allegations lack the
17    necessary details to validate their findings.   For instance, he did not state the
names of providers or discuss any details that would provide credibility to their
18    determination.   For these reasons, I give this opinion little weight.

19    On August 25, 2006, September 10, 2007 and February 10, 2008, Richard W.
Koss, D.O. submitted assessments.   Dr. Koss stated that the claimant's
20    condition had not improved since the lightning accident and that she was only
capable of performing "very minimal self care tasks" before her symptoms
21    would worsen.   She complained of chronic neck pain as well as difficulty
speaking and shortness of breath.   Reportedly it would take "hours to days" for
her breathing to return to normal once she became short of breath.   He
22    performed a physical examination that showed some redness of the posterior

pharynx, her voice became raspy when talking, her range of motion in her neck was decreased, and pain at the C4 and C6 levels was noted. Dr. Koss further cited the prior MRI of the claimant's cervical spine, the neurological evaluation and evidence from the claimant's treating otolaryngologist, all previously discussed.

In addition, Dr. Koss submitted a summary addressed to Dr. Kane concerning his evaluation. He stated that dialogue during the physical examination was limited and was less than would occur during a work situation. He did not find the claimant capable of talking beyond five to ten minutes before she would become short of breath and winded. Any associated physical activity of activities of daily living would exacerbate her symptoms. He stated he personally observed her oxygen saturation levels decrease rapidly.

Based on these findings, Dr. Koss concluded that the claimant was "totally disabled" and had reached maximum improvement. She was incapable of performing "any type of occupation." He determined that the claimant's functioning was below the sedentary level of work. She was unable to complete a frequent positional tolerance circuit and demonstrated a decline in quality of movement and speech toward the end of his evaluation. Her cervical and thoracic pain and elevated heart rate, along with her voice problems, were significant enough to support his findings, according to Dr. Koss. Although compliant with medication, the claimant required complete rest when she became symptomatic.

An updated assessment was submitted in July 2008. Dr. Koss opined that the claimant's condition had worsened since her more recent evaluation based on a video stroboscopy. He further discussed Dr. Hillel's evaluation that showed tension of the neck musculature with "all vocal tasks." Due to the claimant's continued symptoms, he alleged the claimant had to learn sign language to communicate. Treatments, such as speech therapy, had been unsuccessful. She would not benefit from further treatment.

Although Dr. Koss indicated the claimant's condition had worsened based on an updated test, he did not describe any test results that showed a progression of her symptoms. Instead, his allegations were a general statement about her condition. It seems he relied heavily on the claimant's subjective reporting of her symptoms.

In addition, I find that the claimant had a close and personal relationship with Dr. Koss, as indicated by their pictures appearing on the same web site. I accord no weight to his reported findings or his conclusions. His serial endorsements lack credibility. For these reasons, I accord no weight to his

opinions as a professional assessment.   In light of the remainder of the record, I give very little weight to his opinion as lay testimony.

Healthsouth Physical Therapy also submitted a functional capacity assessment. Ms. Drever and Ms. Spearman signed the evaluation.   Their evaluation indicated that the claimant was performing below the sedentary level of work. Specifically, the assessment found that she was unable to complete a frequent positional tolerance circuit and she demonstrated a decline in quality of movement and speech.   She was limited by reports of cervical and thoracic pain as well as an elevated heart rate.   The findings of the musculoskeletal evaluation included mild to moderate decreased cervical range of motion, mild to moderate hypertonicity in the paracervical and upper back and interscapular muscles.

The evaluation determined the claimant's ability to sit was constant, for the duration of 5.5 + hours.   Lifting was limited to five pounds.   Walking could be performed occasionally and standing frequently.   The claimant could occasionally reach overhead and frequently reach at desk level.   Her handling ability was relatively unlimited.

The claimant also subjectively reported to Healthsouth that her activities of daily living were limited, which was included in their evaluation and used to show that she was not capable of performing sedentary work.

I do not give this report much weight.   It appears to be based on the claimant's own subjective reports and those reports are less than credible.   Moreover, this evaluation, as are all such evaluations, is a measure not necessarily of claimant's maximum performance but rather of her performance measured by his [sic] effort.   The restrictions indicated in this document are no more binding on me than claimant's own estimates of his [sic] abilities, given that I conclude that the claimant is not credible.

Although the claimant alleged she was incapable of performing most of her activities of daily living she was able to care for her three adolescent children, she lived in a three level house, she was able to help her children prepare for school and she was able to perform her self care unassisted.   These activities do not indicate she has significant work limitations that would allow her to perform less than sedentary work.

St. Elmo Newton, III, M.D. performed an orthopedic evaluation on January 14, 2004.   The claimant alleged she suffered several injuries following the lightning strike, which included neck pain, chest tightness, left arm discomfort and amnesia.   She alleged her left arm injury was significant enough that she

could not write. The claimant also complained about vocal cord and breathing problems and reported she quit working mainly due to her shortness of breath. An examination was performed that resulted in some discomfort in her neck but the cervical compression was not painful. The neurological examination and strength were normal. He discussed the prior MRI that showed only mild abnormalities. Dr. Newton stated he was unable to comment on the claimant's shortness of breath complaint in relation to her ability to work. He did not recommend additional testing and he professed to not have any opinion as to whether her condition was due to the lightning strike.

Dr. Newton also submitted an opinion that confirmed the findings from Healthsouth, discussed above. Specifically, Dr. Newton decided the evaluators found consistency between measured and observed range of motion; therefore, he found their report accurate. Based on their report, Dr. Newton opined that the claimant would not be capable of returning to her occupation as an osteopathic physician.

I give Dr. Newton's opinions little weight because Dr. Newton, as an orthopedist, did not conclude the claimant would be unable to work based on his orthopedic examination. He provided no comment concerning the claimant's allegations that she was unable to work due to shortness of breath, and I believe he may have been reticent to be entirely forthcoming when dealing with a fellow medical professional.

Concerning his view of Healthsouth's findings, as I discussed previously, their assessment was based mostly on subjective complaints and was inconsistent with some of the testing performed. Therefore, I also do not give much weight to his review of their assessment.

Ronald Kane, M.D., submitted disability statements in 2004, 2005, 2006, and 2007. Dr. Kane, who stated he provided "general medical care" for the claimant, opined that she was unable to work at "any occupation." He found that the claimant's progress has been unchanged since her accident. The reason that she was "permanently disabled" was due to "permanent nerve damage." The claimant was unable to speak, sit, stand, lift or bend. Dr. Kane concluded that the claimant was disabled from "any and all" occupations. I accord no weight to these opinions. The reason supplied by Dr. Kane for her apparent disability was nerve damage; however, the record contains no evidence of a nerve condition. Further, Dr. Kane states that claimant cannot perform any type of work but his evaluations do not contain supporting evidence that would account for his conclusion.

More recent opinions were submitted by Dr. Kane, on May 15, 2008 and August

6, 2008. Again, he reiterated that the claimant had been "totally disabled" since the lightning accident. Dr. Kane did not feel it was necessary to update her functional capacity evaluation because she remained totally and permanently disabled. A further evaluation could impact her health, according to Dr. Kane.

Dr. Kane concludes that the claimant's condition was caused by the lightning strike; however, other physicians have specifically stated that the connection between the accident and her loss of voice/breathing problems is tentative at best. He opined that her voice problem had worsened but did not supply any objective evidence to confirm this finding. Generally, these represent an accommodating global opinion that is unsupported by the medical evidence in the record. For these reasons, I give little weight to his recent opinions.

A psychological evaluation was performed by Richard Washburn, Ph.D., on March 7, 2006. The claimant alleged neck and back problems, loss of motor control, heart problems and vertigo. She reported she was unable to work because she became short of breath if she would talk too much. Testing showed she was able to recall two out of three test words after five minutes, suggesting her delayed memory was adequate. She also could recall seven digits forward and six backward, indicating appropriate adequate auditory, attention and concentration. Dr. Washburn opined, based on the claimant's psychological test results that the claimant's IQ and Index scores ranged from "nearly superior" to "solid average."

The diagnoses were rule out undifferentiated somatoform disorder, psychological stressors and her GAF score was 75, indicating her symptoms were transient, if present. According to Dr. Washburn the examination did not show any evidence of malingering or any areas of significant impairment in her cognitive functioning. He noted she reported symptoms that could not be fully explained by a known general medical condition. The claimant's cognitive functioning was not significantly impaired and she appeared to be above average in intelligence. Based on testing, she would be expected to function adequately in a fairly wide range of employment settings.

This opinion is given significant weight because it was based on objective testing. Dr. Washburn's findings are supported by the medical evidence in the record, which shows her cognitive functioning is intact and would not prevent her from working an ordinary workday. I also weighed heavily the GAF score, which is consistent with her activities of daily living that are performed relatively unrestricted.

01      In sum, the above residual functional capacity assessed is supported by the
        medical evidence in the record, opinion evidence and testimony.
02

03 (AR 22-26; internal citations to record and case law omitted.)

04      Plaintiff argues that the ALJ failed to give adequate weight to the opinions of her

05 treating physicians, Drs. Kane and Koss, and an examining physician, Dr. Newton, that she is

06 unable to work.  She also points to the favorable evaluation by Healthsouth.  Plaintiff

07 maintains that the ALJ inappropriately gave undue weight to non-examining medical

08 consultants and to a non-medical investigator, and improperly inserted his own judgment for

09 those of the medical experts.

10      Plaintiff notes that Dr. Kane regularly treated her for over six years following her injury.

11 (AR 25, 193-273, 344-54, 370-71, 374, 379-90, 441.)  She also takes issue with the ALJ's

12 discussion of Dr. Koss.  She maintains that, regardless of their friendship, the record is clear

13 that there is a treating relationship.  (AR 135, 267, 294.)  Plaintiff also asserts that the ALJ

14 surprisingly and inappropriately delved into the nature of their relationship during the hearing.

15 (AR 429.)  Plaintiff points to her testimony (AR 443-45) and a letter from Dr. Koss (AR 301)

16 disputing the investigator's characterization of events.  Finally, plaintiff again points to the

17 rarity of and difficulty in treating lightning strike injuries. (AR 268, 275, 302, 338, 341-42.)

18 However, as argued by the Commissioner, the ALJ provided sufficient reasons for rejecting the

19 opinions of plaintiff's treating and examining physicians.

20      The record contains medical opinions contradicting the opinions of Drs. Kane, Koss,

21 and Newton, including the opinions of non-examining physicians (AR 26, 161-76, 178-79,

22 183-90) and of an examining psychologist (AR 359-65).  The ALJ also described other

medical evidence unfavorable to plaintiff's claims. As described by the ALJ: "A neurological examination was performed that was fairly normal; her speech was clear, there was no voice tremor, no spastic component or 'breathy voice.' She did have a brief episode of higher pitched voice. In conclusion, the treating neurologist could not find any atypical voice pattern." (AR 18; citing AR 267-68.) He also noted "a relatively normal examination[]" by an otolaryngologist (AR 19; citing AR 282), two examinations by a different otolaryngologist (AR 19; citing AR 337-38 and AR 376-77), and the finding of her treating otolaryngologist that "her airway was completely normal and that obstruction was 'not a problem[,]'" as well as his belief "that her symptoms would eventually abate[]" (AR 19; citing AR 275, 277, 279-80). Additionally, as reflected in the excerpts above, the ALJ noted the inability of physicians to make a correlation between the lightning strike and laryngeal spasms, the relatively normal results of objective testing, evidence of improvement, and plaintiff's failure to follow up on all recommendations. (AR 20-21.)

Plaintiff's arguments with respect to Dr. Koss do not withstand scrutiny. Plaintiff identified Dr. Koss on one form in the record as her "sig[nificant] other" (AR 97) and on another form as her "partner" (AR 130). Numerous forms and letters in the file reveal that they share the same home address. (*See*, *e.g.*, AR 126, 130, 307.) As such, the ALJ reasonably asked questions regarding the nature of plaintiff's relationship with Dr. Koss. The Court finds concerning plaintiff's refusal to be more forthcoming in both the hearing and the briefing before the Court on this issue.[2]

---

2 Dr. Koss presents himself as a personally disinterested physician in one letter in the record, stating, *inter alia*: "As a physician I would have no knowledge of my patients [sic] financial status."

01     Also, given the evidence of their close personal relationship, the ALJ reasonably

02 accorded no weight to Dr. Koss's opinions as a professional assessment. *Cf. Greger v.*

03 *Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006) (ALJ appropriately considered witness's "'close

04 relationship'" to claimant and the possibility that the witness was "possibly 'influenced by'" the

05 desire to help the claimant). The only question, then, is whether the ALJ provided germane

06 reasons for giving very little weight to Dr. Koss's opinions as lay testimony. *See Lewis*, 236

07 F.3d at 511; *Smolen v. Chater*, 80 F.3d 1273, 1288-89 (9th Cir. 1996). The ALJ stated that Dr.

08 Koss indicated a worsening of plaintiff's condition without corresponding test results, that he

09 made general statements about her condition, that he appeared to rely heavily on her subjective

10 reporting of her symptoms, and pointed to the remainder of the record in according Dr. Koss's

11 opinions little weight. (AR 24.) He also, as noted, pointed to Dr. Koss's close and personal

12 relationship with claimant. (AR 22, 24.) This reasoning suffices for the rejection of Dr.

13 Koss's testimony.

14     Nor did the ALJ err in giving little weight to the opinions of Dr. Kane. The ALJ found

15 Dr. Kane's opinions subjective and lacking support, noting specific objective evidence relied

16 on by Dr. Kane revealed only "relatively minor impairments[,]" and pointed to Dr. Kane's

17 vague references to other medical opinions. (AR 23.) He observed that Dr. Kane later

18 attributed plaintiff's disability to nerve damage despite the fact that the record contained no

19 evidence of a nerve condition, and that his evaluations did not provide support for his

20 conclusion that plaintiff could not perform any type of work. (AR 25.) Finally, the ALJ

21

22 ───────────────────────────────────

(AR 304.) Given the evidence of both their personal relationship and their joint participation in the operation of a farm, his statements in this letter appear disingenuous at best.

stated that Dr. Kane's opinion that plaintiff's condition was caused by the lightning strike differed from those of other medical providers who found the connection tentative, that he failed to support a worsening of her condition with any objective evidence, and deemed Dr. Kane's opinion as "an accommodating global opinion that is unsupported by the medical evidence in the record." (AR 26.) As noted by the Commissioner, an ALJ may properly discount a treating physician's opinion where it is "brief, conclusory, and inadequately supported by clinical findings[,]" *Thomas*, 278 F.3d at 957, and based on a claimant's less than credible statements as to her symptoms, *Bray v. Comm'r of SSA*, 554 F.3d 1219, 1228 (9th Cir. 2009). In this case, the ALJ provided sufficient reasons for rejecting the opinions of Dr. Kane.

Likewise, the ALJ provided sufficient reasons for according little weight to the opinions of Dr. Newton. The ALJ described the relatively normal findings by Dr. Newton on examination, stated that Dr. Newton did not conclude plaintiff was unable to work based on his orthopedic examination, instead relying on the findings from Healthsouth, that he provided no comment concerning plaintiff's shortness of breath in relation to her ability to work, and opined that Dr. Newton may have been less than forthcoming in dealing with a fellow medical professional. While the final reason may be pure conjecture, the remaining reasons suffice for according Dr. Newton's opinions little weight.

The Healthsouth report (AR 324-36) came from physical and occupational therapists, neither of whom are regarded acceptable medical sources under Social Security regulations. 20 C.F.R. § 404.1513. As such, their opinions must be given the weight of lay testimony and the ALJ must provide germane reasons for their disregard. *See Lewis*, 236 F.3d at 511. The ALJ stated that the Healthsouth report appeared to be based on plaintiff's subjective reports,

01 which the ALJ found less than credible, and that the evaluation, as all of its type, was "a

02 measure not necessarily of claimant's maximum performance but rather of her performance

03 measured by his [sic] effort." (AR 24.) This assessment was both germane and reasonable.

04        In sum, plaintiff fails to establish error in the ALJ's assessment of the medical evidence.

05 <u>Step Four</u>

06        At step four, the ALJ must identify plaintiff's functional limitations or restrictions, and

07 assess her work-related abilities on a function-by-function basis, including a narrative

08 discussion. *See* 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p. RFC is the most a claimant can

09 do considering his or her limitations or restrictions. *See* SSR 96-8p. The ALJ must consider

10 the limiting effects of all of plaintiff's impairments, including those that are not severe, in

11 determining RFC. §§ 404.1545(e), 416.945(e); SSR 96-8p.

12        Plaintiff argues that the ALJ erred in assessing her RFC, pointing to evidence from Drs.

13 Kane and Koss, the Healthsouth evaluation, and her own testimony. However, this would only

14 be a viable argument if the ALJ erred in his assessment of plaintiff's credibility and the medical

15 evidence. Because the ALJ did not err in those respects, there is no corresponding error in the

16 assessment of plaintiff's RFC.

17        Plaintiff also asserts that she is unsuited to perform work as an osteopathic physician.

18 She notes the absence of any job analysis or vocational expert testimony to support the ALJ's

19 finding. Again, she points to the medical evidence as supporting her contention. (*See* AR

20 318, 343, 361-62, 365.) She also again maintains that the ALJ substituted his own opinion for

21 those of the medical experts and that she should not be penalized for attempting to lead a normal

22 life. She points to a letter from Dr. Koss as "clearly articulat[ing] the physical requirements of

01 the profession and explain[ing she] cannot perform the essential job functions of an osteopathic

02 physician." (Dkt. 11 at 22-23 (citing AR 318).)[3]

03      The ALJ in this case determined plaintiff could perform her past relevant work both as

04 she actually performed it and as such work is generally performed. (AR 26.) He found

05 plaintiff had the capacity for light work and no mental limitations. (*Id.*) He specifically

06 assessed her RFC as follows: able to lift and/or carry twenty pounds occasionally and ten

07 pounds frequently, to stand and/or walk (with normal breaks) for a total of about six hours in an

08 eight-hour workday, to sit (with normal breaks) for a total of about six hours in an eight-hour

09 workday, and to push and/or pull without limitation. (AR 20.)

10      As noted by the Commissioner, the ALJ is not required to call a vocational expert to

11 determine whether a claimant can perform her past relevant work. *Matthews v. Shalala*, 10

12 F.3d 678, 681 (9th Cir. 1993) (a vocational expert's testimony can be useful, but is not

13 necessary at step four). Also, as stated above, the ALJ did not err in the assessment of either

14 the medical evidence or plaintiff's credibility. Nor is Dr. Koss's description of the job of an

15 osteopathic physician or his opinion as to plaintiff's inability to perform this job of particular

16 value. In addition to the fact that Dr. Koss only generally described the physical demands of

17 the job, the ALJ gave sufficient reasons for calling into question the value of Dr. Koss's

18 testimony.

19      Plaintiff bears the burden at step four of demonstrating that she can no longer perform

20 ───────────────

21     3 Plaintiff also raised additional arguments in her reply. However, because they were raised for the first time in plaintiff's reply, giving no opportunity for the Commissioner to respond, the Court declines to consider those arguments. *See Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 n.8

22 (9th Cir. 2009) ("[A]rguments not raised by a party in an opening brief are waived.") (citing *Eberle v. Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990)).

her past relevant work.   20 C.F.R. § 404.1512(a), 404.1520(f); *Barnhart v. Thomas*, 540 U.S. 20, 25 (2003).   In this case, plaintiff failed to meet her burden.   Accordingly, plaintiff's step four arguments also fail.

## **CONCLUSION**

For the reasons set forth above, this matter is AFFIRMED.

DATED this <u>3rd</u> day of December, 2009.

Mary Alice Theiler
United States Magistrate Judge